IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
August 12, 2014 Session

**THEODORE JAMES NUGENT v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Davidson County**
**No. 2012-I-692    Cheryl Blackburn, Judge**

**No. M2014-00014-CCA-R3-PC - Filed October 30, 2014**

The petitioner, Theodore James Nugent, appeals the Davidson County Criminal Court's denial of his timely petition for post-conviction relief, which petition challenged his 2012 guilty-pleaded convictions of domestic assault and aggravated stalking on the grounds that his trial counsel was ineffective and that his guilty pleas were unknowing and involuntary. Because the record supports the decision of the post-conviction court, we affirm that court's order.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR. JJ., joined.

Andrew B. Love, Nashville, Tennessee, for the appellant, Theodore James Nugent.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Victor S. Johnson III, District Attorney General; and Megan King, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The petitioner's counsel-assisted petition for post-conviction relief alleged that the petitioner's trial counsel did not adequately investigate the charges against the petitioner, failed to gather exculpatory evidence, failed to explain the elements of the charged offenses, and failed to seek a reduction of the petitioner's bail. The petition also alleged that, because the petitioner "had to make a decision to plead guilty without sufficient opportunity to be advised of the law regarding the offenses and possible defenses to the charges," the resulting guilty pleas were unknowing and involuntary.

The post-conviction court conducted an evidentiary hearing at which the 51-year-old petitioner testified that the charges in this case resulted from a domestic dispute between him and the victim, his then-wife, Julia Wright Nugent. He said that during an argument on Sunday, March 18, 2012, he grabbed the victim's arm but did not injure her. He denied that he threatened the victim. The petitioner testified that at the time of the offenses, he was trying to persuade the victim to "just give [him] five minutes and just talk" to him. He said a neighbor called the police, and the police arrested the petitioner after he admitted that he had touched the victim on the arm. The petitioner said that he remained in jail from the time of his arrest until he appeared in general sessions court the following Thursday and was released on bail. On the evening before his general sessions court appearance, he was served with an order of protection.

Approximately two weeks later, the petitioner appeared in court pro se for the protective order hearing. He testified that the victim had contacted him twice before the protective order hearing and that, after the hearing, he contacted the victim to arrange for some personalty to be moved and for the preparation of tax returns. The petitioner claimed that the victim had told the petitioner's father that she wished to reconcile.

The petitioner testified that on a night several weeks later, his bail bondsman called to inform the petitioner that he was due in general sessions court the following day for a bond revocation hearing. The petitioner appeared and voluntarily testified at the revocation hearing. When presented with transcripts of some e-mails, the petitioner admitted having sent them to the victim. The court revoked the petitioner's bond, and he was incarcerated. While he was in custody, he conferred with trial counsel, who informed the petitioner that the victim intended to aggressively pursue the charges against him and that the petitioner could remain in jail for several months pending grand jury review unless he agreed to plead guilty.

The petitioner testified that he pleaded guilty in order to get out of jail. He testified that, prior to the incidents with the victim, he had never been in trouble and had never been in jail. He said, "I had a job. I had ownership in a company. I had two animals that no one – I had no one to take care of. Nobody knew I was in jail."

The petitioner testified further that he felt "a lot of pressure" to plead guilty and that he "was afraid." He said that he suffered from bipolar disorder, anxiety disorder, and "ADHD" and that during the 20 days he spent in jail before pleading guilty, he was deprived of the medications he took to treat these illnesses. The petitioner said that the deprivation of his medication resulted in "[w]ithdrawal, anxiety, depression."

The petitioner testified that he did not speak with his trial counsel between the

day of the bond revocation and the appearance date on which he submitted his guilty pleas.

The petitioner testified that before the convictions, he was a board registered polysomnographic technologist and that he lost his "national registry" due to the felony conviction of aggravated stalking. He said that the board would not renew his license. He testified that he did not anticipate this development when he agreed to plead guilty. Additionally, he testified that he could not read without his reading glasses, that he did not have the glasses in jail, and that he was therefore unable to read the plea papers before he signed them.

On cross-examination, the petitioner agreed that he had "quite a few warrants" pending in the general sessions court based upon his "repeated violations of the order of protection." The plea agreement, which the petitioner acknowledged having signed while his case was pending in general sessions court, called for the petitioner's plea to be entered in criminal court. He testified that he spent 20 days in jail awaiting his plea submission hearing in criminal court and that, during that time, he did not see his counsel and "never got a chance to really understand what was going on and ways to defend [himself] in this situation." The petitioner agreed that he chose "the route to take a speedy resolution of the case . . . that would get [him] out of jail." The petitioner acknowledged that during his plea colloquy, the trial judge had asked whether he was satisfied with his attorney and that he replied in the affirmative. The petitioner said that he believed his trial counsel should have endeavored to have his bond revocation reviewed and his bond restored. He agreed that his "beef" with trial counsel was counsel's performance "between the time [his] bond got revoked and the time that it came back into court five days later."

The petitioner's trial counsel testified that the petitioner "kept picking up order of protection violations[, a]nd eventually that turned into aggravated stalking, and I think he had about ten charges total." He added, "I've never had a client so repetitively violate and pick up new charges while I represented them." Nevertheless, counsel initially believed that "a reasonable deal" would be in the offing because none of the petitioner's contacts with the victim were aggressive or threatening; no "egregious violations" occurred.

Counsel stated that he was not informed of the bail revocation proceeding until the petitioner contacted him the night before the hearing. Counsel appeared at the hearing, which was also attended by the victim, who brought proof of the violations in the form of text messages and voice mail recordings. Counsel conversed with the victim and learned that she was adamant about pursuing charges against the petitioner. Counsel was surprised about her attitude because the petitioner had told him that the victim had called the petitioner twice. Counsel iterated that the petitioner had already admitted to the officers that he had contacted the victim and that the petitioner had no defense to the bond revocation other than that the

offenses were "innocuous" and that the petitioner had no prior criminal record. Nevertheless, the general sessions court judge revoked the bond, and that "put [the petitioner] in a corner." Counsel believed that the normal binding-over process to criminal court might take four to six months while the petitioner remained in jail.

Counsel testified that he was unaware of any mental health issues the petitioner may have had; the petitioner did not inform him of such, and the petitioner's interaction with counsel did not suggest such issues.

Counsel opined that asking the criminal court to review the bond revocation would avail the petitioner nothing because he had violated the general sessions court judge's specific "early on" command for him not to "contact this woman." Counsel did not recall whether he advised the petitioner that a motion could be filed to have the bond revocation reviewed. Counsel also opined that pursuing even a successful review of the revocation would have nevertheless caused the petitioner a protracted jail stay. Counsel testified that he arranged for the petitioner's neighbor to take care of the petitioner's house cats. Counsel testified that the time he spent on the case between the revocation hearing and the plea submission hearing was devoted to working on a plea agreement to get the petitioner out of jail.

Counsel testified that he explained to the petitioner that the plea offer included a felony conviction that "would stay on his record." Counsel admitted that he did not discuss the effect of a felony conviction on the petitioner's job or housing options because "[t]here's thousands of conceivable negative consequences from a felony." Counsel acknowledged that he did not like the petitioner's having to plead to a felony but said "it was either that or possibly sit in jail for six months," longer "if you go to trial."

In the order denying relief, the post-conviction court stated that the petitioner "was unable to articulate what Trial Counsel should have done on his behalf other than file to have his bond reinstated and secure a better plea offer." The court found that the petitioner "voluntarily made the choice to accept the plea because it was the quickest way for him to be released from custody and take care of his responsibilities." Thus, the court held that the petitioner failed to show that he was prejudiced by his trial counsel's performance or that his guilty plea was unknowing or involuntary. The court noted that the transcript of the plea submission hearing belied the claim that the plea was unknowing or involuntary.

On appeal, the petitioner posits that his trial counsel was ineffective in the following ways: failing to move for a continuance of the bond revocation hearing to protect the petitioner's right to procedural due process and his bargaining position vis-a-vis the State; failing to advise the petitioner of his right to seek review of the bond revocation; and failing

to advise the petitioner of the adverse effects of a felony conviction on his career. Further, he posits that, "as a result of counsel's mistakes," he was "coerced" into pleading guilty.

Post-conviction relief is available only "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103 (2006). A post-conviction petitioner bears the burden of proving his or her allegations by clear and convincing evidence. *Id.* § 40-30-110(f). On appeal, the appellate court accords to the post-conviction court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

To establish entitlement to post-conviction relief via a claim of ineffective assistance of counsel, the post-conviction petitioner must affirmatively establish first that "the advice given, or the services rendered by the attorney, are [not] within the range of competence demanded of attorneys in criminal cases," *see Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and second that his counsel's deficient performance "actually had an adverse effect on the defense," *Strickland v. Washington*, 466 U.S. 668, 693 (1984). In other words, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

Should the petitioner fail to establish either deficient performance or prejudice, he is not entitled to relief. *Strickland*, 466 U.S. at 697; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697.

When reviewing a claim of ineffective assistance of counsel, we will not grant the petitioner the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

In the context of a guilty plea, the petitioner must establish that "counsel's constitutionally ineffective performance affected the outcome of the plea process" by establishing "a reasonable probability that, but for counsel's errors, he would not have

pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985); *see Hicks v. State*, 983 S.W.2d 240, 246 (Tenn. Crim. App. 1998).

Apart from whether a guilty plea is the product of ineffective assistance of counsel, it is invalid if otherwise made unknowingly or involuntarily. "Whether a plea was knowing and voluntary is an issue of constitutional dimension because 'the due process provision of the federal constitution requires that pleas of guilty be knowing and voluntary.'" *State v. Wilson*, 31 S.W.3d 189, 194 (Tenn. 2000) (quoting *Johnson v. State*, 834 S.W.2d 922, 923 (Tenn. 1992)). A plea "may not be the product of '[i]gnorance, incomprehension, coercion, terror, inducements, [or] subtle or blatant threats." *Wilson*, 31 S.W.3d at 195 (quoting *Boykin v. Alabama*, 395 U.S. 238, 242-43 (1969)); *see also State v. Mellon*, 118 S.W.3d 340, 345 (Tenn. 2003) (citing *Blankenship v. State*, 858 S.W.2d 897, 904 (Tenn. 1993)).

Both claims of ineffective assistance of counsel and involuntary guilty plea are mixed questions of law and fact. *Lane v. State*, 316 S.W.3d 555, 562 (Tenn. 2010); *State v. Honeycutt*, 54 S.W.3d 762, 766-67 (Tenn. 2001); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). When reviewing the application of law to the post-conviction court's factual findings, our review is de novo, and the post-conviction court's conclusions of law are given no presumption of correctness. *Fields*, 40 S.W.3d at 457-58; *see also State v. England*, 19 S.W.3d 762, 766 (Tenn. 2000).

Upon our review, we conclude that the record supports the post-conviction court's factual findings and its application of the law to those findings. Counsel testified that the general sessions court judge told the petitioner "early on" not to contact the victim. Thus, the result in the petitioner's criminal case was precipitated initially by his series of violations of the victim's protective order, and these acts in turn provided a basis for both the felony charge of aggravated stalking and the revocation of the petitioner's bond. Then, at that point, the petitioner was incarcerated, a condition that he understandably found to be intolerable. Based on the record, the post-conviction court inferred from the testimony that the petitioner's main objective – and hence that of his counsel – was to liberate the petitioner from confinement. We cannot say that counsel's actions did not advance this objective, and accordingly, we agree with the post-conviction court that the petitioner failed to establish by clear and convincing evidence prejudice on an ineffective assistance claim.

That said, the petitioner has proven no ineffective assistance of counsel that *ipso facto* could serve to vitiate his willingness to plead guilty. On the other hand, as we have mentioned, a claim of an unknowing and involuntary guilty plea can be based on circumstances other than the performance of counsel. In this case, we have looked specifically at the contention that the resulting felony conviction damaged his career and that

his being unaware of that result vitiated his guilty plea.

"[N]either our federal nor state constitution requires that an accused be apprised of every possible or contingent consequence of pleading guilty before entering a valid guilty plea. Courts are constitutionally required to notify defendants of only the direct consequences--not the collateral consequences--of a guilty plea." *State v. Ward*, 315 S.W.3d 461, 466-67 (Tenn. 2010). This court has previously characterized a loss of employment resulting from a guilty-pleaded felony conviction as a collateral consequence of the plea. *Linda Blair v. State*, No. W2010-00627-CCA-R3-PC, slip op. at 6 (Tenn. Crim. App., Jackson, Nov. 18, 2010). For this reason, we hold that the defendant's guilty pleas were not infirm because he was unaware that the felony conviction would adversely affect his employment or career.

As a result, we affirm the judgment of the post-conviction court.

_____
JAMES CURWOOD WITT, JR., JUDGE